UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 20-106 (DWF/BRT)

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.                                          **GOVERNMENT'S POST-
                                                    HEARING MEMORANDUM IN
                                                    OPPOSITION TO DEFENDANT
(1) LAMOND LEROY MCCABE,                            MCCABE'S MOTIONS TO
        a/k/a "Pimp,"                               SUPPRESS EVIDENCE**

                    Defendant.


        The United States of America, by and through its attorneys, Erica H. MacDonald,

United States Attorney for the District of Minnesota, and Ruth Shnider, Assistant United

States Attorney, hereby submits this response Defendant Lamond McCabe's post-hearing

memorandum in support of his motions to suppress evidence (ECF No. 74).  Co-defendant

Mario Rolack's pretrial motions have been withdrawn in anticipation of a guilty plea and

thus will not be addressed further.  (*See* ECF No. 76).

        In addition to the arguments set forth below, the Government incorporates by

reference the arguments previously contained in its pre-hearing brief at ECF No. 60.  For

all these reasons, McCabe's motions to suppress evidence should be denied in full.

## I.     FACTUAL OVERVIEW

        Starting around March 9, 2020, officers with the Minneapolis Police Department

(MPD) received information from a confidential reliable informant (CRI) concerning

multiple men who were selling large quantities of cocaine in the Minneapolis area.   (Tr.

16, 49).[1]   The CRI said one of these individuals was on federal supervision, used the nickname "Rio," and conducted narcotics transactions out of a van with an "R&R" logo on the side.  (Tr. 16-17).  Officers knew that Defendant Mario Rolack went by the name "Rio," and they were able to corroborate through traffic stop records and surveillance that Rolack (who was on federal supervised release) drove a Chevrolet Astro van with an "R&R" logo on the side.  (Tr. 17-18).  The CRI also said "Rio" obtained cocaine from a different male named "Cory," who had stash houses throughout the metro.  (Tr. 50-52).  The CRI provided various pieces of information regarding "Cory," including a vehicle description, that officers were able to corroborate, leading to the identification of uncharged co-conspirator C.K.  (Tr. 18-19).  On March 11, 2020, officers conducted an Ion drug swab on the handle of C.K.'s vehicle, which was positive for cocaine.  (Tr. 19).

On March 19, 2020, MPD officers conducted surveillance and saw C.K. leave his Farmington residence in his vehicle and stop at two different banks.  (Tr. 20).  C.K. was driving in an "elusive" manner—making "unexplained turns" and stops that seemed indicative of countersurveillance for law enforcement.  (Tr. 20-21).  Later that day, officers observed C.K. drive to an apartment building at 1400 Laurel Avenue in downtown Minneapolis.  (Tr. 21).  The high-rise apartment building at 1400 Laurel is named the Wilson Park Tower, and it is part of a complex of buildings called Laurel Village.  *See* https://www.laurelvillage.com/wilson-park-tower-1; (Tr. 25).

---

[1]   Citations throughout to "Tr. _" refer to the transcript of the motions hearing held on October 16, 2020, and, in particular, the testimony of Minneapolis Police Sergeant Darcy Klund.

C.K. parked outside the 1400 Laurel building and a second male (later identified as Defendant Lamond McCabe), came outside carrying a paper bag, met briefly in C.K.'s vehicle, and then emerged without the bag.  (Tr. 22, 54).  A short time later, C.K. was observed driving to a nearby surface parking lot at 15th Street and Nicollet and having a second meeting with the same male (i.e., McCabe).  (Tr. 22).  The two men appeared to have some sort of exchange, and an officer monitoring a nearby surveillance camera observed movements consistent with money being counted.  (Tr. 22-23).  The man who met with C.K. (i.e., McCabe) was driving a white Buick Enclave vehicle. (Tr. 22).

During the rest of March 19, C.K. was observed driving throughout South Minneapolis and having at least three short meetings in his vehicle with other individuals that were consistent with narcotics transactions (i.e., "drops" of drugs and/or money).  (Tr. 23-24, 61-63).  One of these short meetings was between C.K. and an individual who matched the physical description of Rolack.  (Tr. 23-25).  This time, Rolack was driving another van that officers had previously observed parked at his residence along with the Chevy Astro "R&R" van.  (Tr. 23).

MPD officers then spoke with the Laurel Village management company and learned that the man they had observed meeting with C.K. on March 19 was renting Apartment 1703 at 1400 Laurel under the name "William Mehan" and Florida state identification.  (Tr. 25-26, 56). The management company requested that officers return with a search warrant if they wanted more detailed records concerning the renter.  (Tr. 26-27).  Officers then ran some database queries for "William Mehan" in Florida and were not able to locate a true

identity corresponding to the information. (Tr. 27).   This suggested the renter may be using an alias which, again, was consistent with narcotics trafficking.  (Tr. 27, 57).

Officers then obtained a search warrant for additional records related to Apartment 1703 from the management company of 1400 Laurel.  (Ex. A).  The warrant clearly sought records held by the managing entity of the building, and listed the premises to be searched as "Wilson Park Tower Apartments, 1400 Laurel Avenue, Minneapolis."  (Ex. A at bates 1106).  In fact, the Laurel Village management office housing the records, while part of the same complex of buildings as 1400 Laurel, is at a different address on Hennepin Avenue.  (Ex. A at bates 1109; Tr. 68).  The management company produced the requested records without objection, including a purported pay stub for "William Mehan" that listed an employer address in Monticello, learned to be McCabe's residence.  (Tr. 28).  The records also contained a copy of "William Mehan's" photo identification, which in fact displayed a picture of McCabe.  (Tr. 28-29).

During additional surveillance, law enforcement officers observed the same white Buick Enclave (from March 19) parked outside McCabe's residence in Monticello, and they learned the Buick was registered in McCabe's name.  (Tr. 29).  Officers thus confirmed that McCabe was the person they observed meeting with C.K. on March 19, and that he was renting Apartment 1703 under an alias.  (Tr. 29).  Given the information and observations collected at that point, officers believed McCabe and C.K. were using Apartment 1703 to distribute cocaine.  (Tr. 29).

4

MPD officers then obtained a search warrant to conduct an Ion drug swab on the exterior door handle and door frame of Apartment 1703 at 1400 Laurel Avenue.  (Ex. C; Tr. 29-20).  The warrant contained standard language authorizing the swab to be taken between 7 a.m. and 8 p.m.  (Ex. C at bates 1117).  In the early morning of March 25, 2020, officers entered the building using a key fob that management provided and performed the swab on the apartment's exterior door, which faced into a common hallway.  (Tr. 31, 33). In what by all accounts was an entirely inadvertent mistake that escaped notice at the time, officers took the swab at 6:15 a.m., slightly before the time frame authorized by the warrant.  (*Id.* at bates 1118; Tr. 31-32).  Results obtained a few hours later were positive for trace amounts of cocaine.  (Tr. 34-35; Ex. D at bates 867).

While the Ion swab was taking place, other MPD officers were already up on surveillance of McCabe at his primary residence in Monticello. (Tr. 34).  Officers observed McCabe leave his residence around 9 a.m. in his white Buick Enclave and drive to a residence on the 9000 block of Emerson Avenue South, in Bloomington.  (Tr. 35-36). Along the way, officers observed him driving in an erratic and indirect fashion that was consistent with countersurveillance.  (Tr. 36).

Shortly after McCabe arrived at the Bloomington residence, Rolack arrived in his Chevrolet Astro van with "R&R" on the side, and the two met outside.  (Tr. 36).  At one point, McCabe appeared to retrieve some items from his Buick, and he and Rolack entered the garage of the residence and shut the door behind them.  (Tr. 36-37). After about 15 minutes, McCabe and Rolack were seen exiting the garage with a large rolling duffel bag,

which they loaded into McCabe's Buick Enclave before departing in their respective vehicles.  (Tr. 37).  Law enforcement followed as McCabe and Rolack drove in tandem to 1400 Laurel Avenue, where they were observed removing the rolling duffel bag from McCabe's Buick and rolling it into the apartment building together.  (Tr. 37-38).

Within about "two minutes," C.K. also arrived and entered the 1400 Laurel building.  (Tr. 38).  Over the next few hours, C.K. was observed departing and returning to 1400 Laurel multiple times, consistent with narcotics dealings.  (Tr. 38, 76-77).  At one point, McCabe was observed coming out of 1400 Laurel to C.K.'s waiting vehicle and handing C.K. a bag.  (Tr. 38, 77).  C.K. then drove to 15th and Nicollet and a female companion was observed exiting C.K.'s vehicle and having some kind of brief meeting with a person in another vehicle parked nearby.  (Tr. 77-78).  C.K. then drove into South Minneapolis and, at some point, the officers tailing him began to suspect he had "spotted" them, as he began driving more erratically and turning into alleys.  (Tr. 38).  MPD Officer Marcus Ottney began writing a warrant to search Apartment 1703, while other officers maintained surveillance on the 1400 Laurel building and on C.K.  (Tr. 39).

At approximately 1:30 p.m., while the officers were awaiting a signed warrant for Apartment 1703, McCabe and Rolack exited the front door of 1400 Laurel together, with Rolack rolling the same large duffel bag.  (Tr. 39).  McCabe placed the duffle into his Buick, and Rolack began walking towards his Astro van parked about a block away.  (Tr. 39, 81).  Officers approached and placed them both under arrest.  (Tr. 39-40).  At the time officers approached, McCabe was on his cellphone and made an utterance that he was

"f***ed." (Tr. 40).  Rolack was found to be in possession of around $700 cash and six cellular phones, which was consistent with drug trafficking activities.  (Tr. 40-41, 82). MPD officers secured and towed both McCabe's Buick and Rolack's Astro to the police impound lot to await search warrants.  (Tr. 41).

Following the arrests, officers received the signed search warrant for Apartment 1703 and executed it.  (Tr. 42; Def Ex. E).  Inside the apartment, officers located (among other things), Pyrex cookware, a large quantity of rubber gloves, drug packaging, and a money counter—consistent with "a larger scale" drug operation and cooking crack cocaine. (Tr. 43).  In the drawer under the stove, officers observed white residue that field-tested positive for cocaine.  (Tr. 43).  The searching officers observed that the apartment appeared not to be used as a genuine living space. (Tr. 42).

Later that day, officers obtained search warrants for the Buick Enclave and the Chevy Astro.  (Ex. D; Ex. 1).  The black duffel bag was located in the back of the Buick and was found to contain around 30 kilograms of cocaine, over 700 grams of crack cocaine, two firearms, and drug packaging equipment.  (Tr. 44).  Inside the Chevy Astro, officers located a small amount of cocaine, some documents in Rolack's name, and one additional cellular phone. (Tr. 45).

### III.    ARGUMENT

McCabe maintains his Fourth Amendment challenges to the following five events:

1.    The March 23, 2020 search for records held by the Laurel Village management office, pursuant to a search warrant.  (Ex. A).

2.    The March 25, 2020 Ion drug swab taken from on the exterior door handle/frame of Apartment 1703, pursuant to a search warrant.  (Ex. C).

3.    The March 25, 2020 warrantless seizure (i.e., tow) of McCabe's Buick Enclave from the scene of his arrest to the police impound lot.

4.    The March 25, 2020 search of the contents of McCabe's Buick Enclave, pursuant to a search warrant.  (Ex. D).

5.    The March 25, 2020 search of the interior of Apartment 1703, pursuant to a search warrant. (Ex. E).

For the reasons set forth below, all of these challenges are entirely without merit and McCabe's motions should be denied.

### A.    <u>Introduction & Relevant Legal Standards</u>

As most of McCabe's arguments relate to the validity of search warrants, some introductory comments regarding the search warrants in this case are in order.  It is of course well established that a search warrant affidavit sets forth adequate probable cause if it describes circumstances showing a "fair probability" that contraband or evidence of a crime will be found in a particular place. *United States v. Montes-Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009). "A determination whether probable cause has been established involves a practical, common sense evaluation of the totality of the circumstances." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) (quotations omitted). An issuing judge

also "may draw reasonable inferences . . . in determining whether probable cause exists." *United States v. Wallace*, 550 F.3d 729, 732 (8th Cir. 2008).

In reviewing a warrant, "great deference" is to be accorded the issuing judge's determination of probable cause. *United States v. Hudspeth*, 525 F.3d 667, 674 (8th Cir. 2008*); Illinois v. Gates*, 462 U.S. 213, 236 (1983). "On a motion to suppress, a district court should not make a de novo determination of probable cause," *Reivich*, 793 F.2d at 959, and "need only ensure that the issuing official had a substantial basis to conclude that probable cause existed," *United States v. Anderson*, 933 F.2d 612, 614 (8th Cir. 1991) (citations omitted).

Even if a search warrant affidavit does not meet the probable cause standards set forth above, "[u]nder the good-faith exception, evidence seized pursuant to a search warrant issued by a magistrate that is later determined to be invalid will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable." *United States v. Proell*, 485 F.3d 427, 430-31 (8th Cir. 2007) (discussing *United States v. Leon*, 486 U.S. 897 (1984)). For the good-faith exception to be inapplicable, the affidavit must be "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923.

Importantly, this Court may consider the testimony of Sergeant Klund regarding additional facts known to the MPD officers at the time of each search in determining whether the good faith exception is satisfied: "In assessing the objective reasonableness of a police officer's execution of a warrant [under *Leon*], [a court] must look to the totality

9

of the circumstances, including any information known to the officer but not presented to the issuing judge." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015).

As is demonstrated in the search warrant applications and the testimony of Sergeant Klund, this was an extensive and thorough investigation by the MPD into McCabe, Rolack and other co-conspirators. Officers collected numerous pieces of information indicative of drug-trafficking at each step of the investigation, and developed abundant probable cause to search each location that was ultimately searched. It is true that, as can be expected in a fast-paced narcotics case, any particular search warrant affidavit does not necessarily recite *every single relevant fact* known to officers at that time. Nonetheless, upon review of each challenged warrant, this Court can easily conclude based on the four corners of the affidavit that there was a substantial basis for the issuing judge to find probable cause, or that good faith applies. In the event the Court finds a four-corners review to present a close question, the officers' good faith in obtaining and executing each search warrant is confirmed by the testimony of Sergeant Klund, who gave a thorough narrative of the investigation and explained the principal information known to officers at the time of each challenged search.

Finally, as to the technical deficiencies that McCabe alleges in the warrants for the Ion swab and the rental records, McCabe lacks Fourth Amendment standing to bring these challenges, and they otherwise fail on the merits. All of McCabe's motions to suppress should be denied.

### B.      Any Issues with the Ion Swab Warrant or the Timing of Its Execution Do Not Supply a Basis for Suppression of Evidence

McCabe continues to challenge the warrant authorizing an Ion swab on the outer door of Apartment 1703, claiming the execution of the warrant 45 minutes prior to the time frame stated in the warrant rendered the search invalid, and that the affidavit lacks probable cause. (Def. Br., ECF No. 74, at 1-8). As the Government has already explained, this Court need not rule on the freestanding validity of the Ion swab warrant *per se*, because the Government has no need to present the Ion swab evidence in its case-in-chief at trial. (*See* Gov. Br., ECF No. 60, at 12). The only issue for the Court is whether any problems with the Ion swab would somehow undermine a later search warrant or other aspect of the investigation. For at least the following reasons, any issues with the Ion swab have no effect on the other evidence in the case.

*First*, McCabe has not met his burden to demonstrate that he has Fourth Amendment "standing" to challenge the Ion swab. *See United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995) ("The defendant moving to suppress bears the burden of proving he had a legitimate expectation of privacy that was violated by the challenged search."). In fact, as the Government has previously observed, both federal and Minnesota state case law holds that a tenant like McCabe generally does *not* have the requisite privacy or property interest to challenge the search of an apartment door that faced into a common hallway of a multi-unit building.[2] McCabe points to an inapposite, out-of-circuit case involving "the curtilage

---

[2]     *See, e.g.*, *United States v. Burston*, 806 F.3d 1123, 1129 (8th Cir. 2015) (discussing prior case law and noting that "a drug-sniffing dog in a *common* interior apartment hallway where the

11

of a home" to argue in passing that he has the requisite standing. *United States v. Charles*, 290 F. Supp. 2d 610, 614 (D.V.I. 1999); (Def. Br., ECF No. 74, at 1). For one thing, *Charles* did not involve a common hallway of a large apartment complex. *Charles* also acknowledged that whether an area is protected "curtilage" to a residence generally turns on four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987); *see United States v. Hopkins*, 824 F.3d 726, 731 (8th Cir. 2016) (same); *Charles*, 290 F. Supp. 2d at 614 n.2.

These factors considered alongside the record evidence do not establish McCabe's standing to challenge the Ion swab. Sergeant Klund testified that 1400 Laurel was a "high rise" apartment building with at least "dozens" of apartments. (Tr. 31). The door handle and frame that was swabbed faced a "common hallway" with doors directly into each apartment; there were no "private vestibules" or walkways into each apartment. (Tr. 31). Anyone could have walked down the hall and touched the same areas in a similar manner. (Tr. 31). The management company informed MPD officers that tenants in the building generally are *not* permitted to affix things to the outer doors of their apartments, to change their own locks or door knobs, or to store property in the common hallway—and these

_____

officer and drug dog were *both* constitutionally permitted" is lawful); *United States v. Mathews*, No. Crim. 13-79 ADM/AJB, 2013 WL 5781566, at *3 (D. Minn. Oct. 25, 2013), *aff'd*, 784 F.3d 1232 (8th Cir. 2015) (no reasonable expectation of privacy in "apartment common area or hallway"); *State v. Edstrom*, 916 N.W.2d 512, 517-23 (Minn. 2018) (dog sniff on "seam" apartment door in common hallway did not implicate Fourth Amendment rights of tenant).

policies are discussed with tenants at the start of their lease. (Tr. 33-34). Moreover, officers taking the swab were present in the hallway with the authorization of the management company, who gave them a key fob to enter the common areas of the building. (Tr. 33). Based on these facts in the record, McCabe has not met his burden to show that he had a sufficient privacy or property interest in the outer door of his apartment to challenge the Ion swab at all.

**Second**, all the subsequent search warrants and investigative steps were entirely independent of anything learned in the Ion swab. Any error in the swab thus provides no basis to suppress other evidence. *See, e.g., United States v. Reed,* 921 F.3d 751, 753–56 (8th Cir. 2019) (defendant must show that alleged illegality was "at least a but-for cause of obtaining the evidence" to be suppressed); *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008) (under "independent source doctrine," evidence recovered in later search warrant not suppressible where "police [would] have applied for the warrant had they not acquired the tainted information" and the "affidavits support probable cause after the tainted information has been redacted from them"). Sergeant Klund confirmed that the Ion swab was "just a small piece" of an investigation that included a litany of direct observations of McCabe and his co-conspirators engaged in drug trafficking. (Tr. 32). Sergeant Klund also made absolutely clear that even if the Ion swab had never taken place, the subsequent steps in the investigation would have remained the same. (Tr. 32, 34-35). Indeed, on the morning of March 25, Sergeant Klund and other officers were *already up on surveillance at McCabe's house* at the time the swab was taken, and did not learn of the

13

results for at least a few hours. (Tr. 34). Thus, if the swab had been negative for drugs, or had not taken place at all, officers still would have observed all the key events that day that led up to the subsequent search warrants. (Tr. 35). Finally, if references to the Ion swab are excised from every other search warrant, each would still contain probable cause.

**Third**, even if the Ion swab were more critical to a finding of probable cause, officers were still entitled to rely on the later-obtained search warrants in good faith because the officers' prewarrant conduct was not "clearly illegal." *United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016). As the Government already explained (Gov. Br., ECF No. 60, at 15-16), particularly given the nonintrusive nature of the swab, the timing discrepancy was not the type of error that would undermine good faith reliance on later warrants that mentioned the results.[3] Indeed, officers did not even notice the timing error at the time and could easily have waited 45 minutes if they had; at most, this was "isolated negligence" not warranting exclusion of later-obtained evidence. (Tr. 32-33); *see United States v. Tuton*, 893 F.3d 562, 570 (8th Cir. 2018). And McCabe's challenges to the probable cause set forth in the swab warrant are baseless. While McCabe seizes on particular word choices, or the affidavit's omission of particular details known to be true, there can be no doubt that a reasonable reading of the facts contained in the affidavit establishes ample basis to believe that Apartment 1703 was connected to drug trafficking. At a minimum, the affidavit establishes that McCabe was renting Apartment 1703 under a false alias, and

---

[3]     The officers' actions here are not remotely comparable to *Jones v. Kirchner*, 835 F.3d 74 (D.C. Cir. 2016), where agents executed a daytime warrant to search an entire residence at 4:45am while the defendant was in bed. (*See* Def. Br., ECF No. 74, at 2-3).

on March 19, McCabe was observed exiting the building and engaging in what appeared to be a narcotics transaction with C.K., a previously identified drug trafficker, who then drove off and made what appeared to be drug "drops" throughout the city. (Ex. C at bates 1112-1114). In sum, the substance of the Ion swab warrant and the timing of its execution were, at a minimum, close enough to the line of validity that later warrants that mention the swab results are entitled to good faith.

## C.   McCabe Lacks Standing to Challenge the Search of a Third-Party Management Office and In Any Event His Challenge Is Meritless

McCabe's post-hearing brief all but concedes that his various challenges depend on suppressing the information officers learned from the Laurel Village management company, which showed that McCabe was renting Apartment 1703 under a false identity. But McCabe still has not surmounted a fundamental obstacle: as the Government already explained (Gov. Br., ECF No. 60, at 9-10), McCabe has not shown and could not show a legitimate expectation of privacy in records held by the management company.

McCabe's post-hearing brief does not cite to a single case finding a defendant to have an expectation of privacy in records of this nature, held by a third-party. He instead claims that various regulations governing credit reports, financial institutions, and disclosures to tenants by "residential screening services" would confer upon a tenant a reasonable expectation of privacy in records held by his landlord. (Def. Br., ECF No. 74, at 9-10). This argument fails for several reasons. To begin, it does not appear that the types of records and/or entities governed by the cited regulations have anything to do with the facts in this case. But, regardless, McCabe cites no authority to suggest that such

regulations would alter the long-established parameters of the third-party doctrine under *the Fourth Amendment*.  In fact, the Eight Circuit has squarely stated that "[e]ven where a person discloses information to a third party *on the assumption that it will be used only for a limited purpose*, the government typically is free to obtain that information without infringing on a legitimate expectation of privacy of the person who made the original disclosure*." United States v. Sesay*, 937 F.3d 1146, 1152 (8th Cir. 2019) (emphasis added).

Looking to the "nature of the records sought," as McCabe urges, only confirms he had no reasonable expectation of privacy in them.  *See United States v. Miller*, 425 U.S. 435, 442 (1976).  Many of the records obtained through the warrant were *fraudulent* documents that McCabe presented to a landlord in order to rent an apartment under *a fabricated identity*.  For example, Sergeant Klund testified that the key information in the rental file linking "William Mehan" to McCabe was a phony pay stub and a fake photo ID.  (Tr. 27-29).  McCabe's own "private" information is not implicated by these records at all, and he cannot reasonably claim to have had an expectation of privacy in false documents provided to a third-party for illegal purposes.  Nor would society recognize as reasonable any expectation of privacy in the rental forms provided by "William Mehan" to the management company, or in the security surveillance video or entry records that the management company itself generated and retained.  (*See* Tr. 68)

Most importantly, McCabe simply has not offered any basis to differentiate the records obtained here from usage records held by a power company; guest registration records collected by a motel; account transaction records retained by a bank; tax returns

16

provided to an accountant; or an individual's call records held by a phone company—all of which have been held to fall under the third-party doctrine. *See Sesay*, 937 F.3d at 1152 (collecting cases); *United States v. McIntyre*, 646 F.3d 1107, 1111–12 (8th Cir. 2011) (collecting cases).   Because McCabe lacked a reasonable expectation of privacy in the rental records, McCabe's challenge to the warrant must fail.

Even if the Court reaches the merits, McCabe's motion should be denied.  As the Government has already argued, controlling case law clearly demonstrates that the address "misdescription" in the warrant does not give rise to grounds for suppression.  (*See* Gov. Br., ECF No. 60, at 10-11).  The face of the warrant clearly seeks records held by the controlling entity of the 1400 Laurel building, and the affidavit is clear that officers had already been in conversations with staff from the management company at that point.  (Ex. A at bates 1100, 1103).  The office housing the relevant records was located in the same "complex" as the target building identified in the warrant, but simply had a different "physical address."  (Tr. 68).  Indeed, given that the warrant focused on one particular apartment and tenant, it was not necessarily erroneous for the warrant to identify the target building that the records related to, rather than the clerical office around the corner where they happened to be stored.  In either case, the *custodian* of the records covered by the warrant was clear, and there was no reasonable probability that officers would improperly search an unauthorized person or somehow obtain records outside the scope of the warrant. And in any event, good faith applies.  *See United States v. Thomas*, 263 F.3d 805, 808-09

(8th Cir. 2001) (warrant listing entirely incorrect address entitled to good faith because affidavit and surrounding circumstances clearly demonstrated the intended location).[4]

### D.   Both the Seizure and Search of McCabe's Buick Were Supported by Probable Cause

McCabe persists in his challenges to both the "warrantless seizure" of his Buick (i.e., the towing of the Buick from 1400 Laurel to the police impound lot), and the search of that Buick pursuant to the search warrant at Exhibit D.  McCabe concedes that under longstanding authority surrounding the "automobile exception," officers with probable cause to search a vehicle may also seize the vehicle and search it later, with or without a warrant.[5]  (*See* Def. Br., ECF No. 74, at 12).   As such, these two challenges may be resolved together on the basis of Sergeant Klund's testimony at the motions hearing; this Court only need find that there was probable cause to search the Buick at the time it was towed in order to find that the seizure and later search were lawful.

---

[4]    In the unlikely event that this Court finds a basis to suppress the rental records, McCabe could not show that suppression should extend to any later-discovered evidence.  Officers suspected "William Mehan" was an alias before the records warrant was executed.  (Tr. 27).  And Sergeant Klund was clear that even without the rental records, officers would have linked McCabe to "William Mehan" and learned of his home address because the Buick Enclave, which officers observed meeting with C.K. days earlier, was registered to McCabe at his home.  (Tr. 72-73).

[5]    *See Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("[W]e see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant."); *Michigan v. Thomas*, 458 U.S. 259, 261, 102 S. Ct. 3079, 3080, 73 L. Ed. 2d 750 (1982) ("[W]hen police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody."); *United States v. Wells*, 347 F.3d 280, 288-89 (8th Cir. 2003) (same).

As detailed in Sergeant Klund's testimony and summarized in Section I above, the probable cause to search the Buick on the afternoon of March 25 is so clear that the Government will not belabor it at length.  Leading up to March 25, officers had collected significant evidence linking McCabe to drug trafficking and to an apparent "stash house" at 1400 Laurel.  Then, on March 25, McCabe was observed picking up a suspicious duffel bag in Bloomington, bringing it to the stash house apartment in his Buick, engaging in at least one suspicious exchange with C.K., and then exiting the 1400 Laurel building **with the suspicious duffel bag and loading it back into the Buick**.  Then, upon officers' approach, McCabe made an expletive-laced utterance into his phone, signaling consciousness of guilt.  These circumstances are miles apart from the *Hogan* case, cited by McCabe (Def. Br., ECF No. 74, at 13), where officers' only information at the time the car was seized was that the defendant used a *different* vehicle for transporting drugs.  *United States v. Hogan*, 25 F.3d 690, 693 (8th Cir. 1994).  In this case, on March 25, officers had every reason to believe that they were observing McCabe use his Buick to transport drugs right in front of their very eyes.

McCabe makes various other contentions that do not fundamentally alter the probable cause analysis.  He emphasizes that the CRI did not provide information concerning McCabe (Def. Br., ECF No. 74, at 13); that officers, at times, expressed their inferences in the language of suspicion rather than certainty (*id.* at 14); that officers did not physically observe drugs or money being exchanged out in the open (*id.*); and that officers did not exhaustively explore every connection between C.K. and Apartment 1703 (*id.* at

15).  He also suggests that McCabe may have had non-drug-related reasons for lying in his rental application materials.  (*Id.* at 15).  Given the totality of the information that *was* known to officers by the afternoon of March 25, McCabe's post-hoc arguments boil down to little more than nitpicks.  Officers had an array of direct observations and other information linking McCabe and his Buick to drug trafficking.  And "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *D.C. v. Wesby*, 138 S. Ct. 577, 588 (2018).

Based on the information known at the time, officers could have conducted a probable cause search of the Buick immediately upon McCabe's arrest.  The seizure and later search of the Buick was thus equally proper.

Even if the Court reviews the warrant to search the Buick on its own terms, the search was supported by probable cause.  McCabe's challenges to the Buick affidavit are similar to those outlined above, and his demands for "certainty" or specifics  in particular observations do not undermine the totality of all the facts contained therein, which were informed by the affiant's training and experience in drug investigations.  Although the affidavit does not contain every fact known to officers at the time, it does establish, at a minimum, that McCabe used the Buick to drive to an apparent drug-related transaction on March 19, and to transport the suspicious duffel on March 25, and on both occasions to come from or go to an apparent stash house that he was renting under an alias.  (Ex. D at bates 864-867).  Based on these facts alone, the issuing judge had a substantial basis for

20

concluding there was a fair probability that evidence of drug trafficking would be found in the Buick.

It is of no moment that the affidavit does not specifically state that officers observed McCabe and Rolack loading the duffel *into* the Buick at the Bloomington residence. (*See* Def. Br., ECF No. 74, at 21). The inference is clear given the suspicious meeting in the garage, and the fact that the Defendants then drove "directly" to 1400 Laurel where they *unloaded* the duffel from the Buick. (Ex. D at bates 867). It is also not surprising that the affidavit "fails to state . . . that officers observed McCabe exit 1400 Laurel and load the black duffle bag on wheels into the Buick Enclave" right before the arrests. (Def. Br., ECF No. 74, at 22). It appears McCabe and Rolack emerged unexpectedly from the apartment building while the warrants were in the process of being written. (Tr. 39). In any event, the facts that *are* contained in the affidavit still provided probable cause to believe that evidence of drug-trafficking would be found in the vehicle. Certainly, the Eighth Circuit has found probable cause based on far less. *See, e.g., United States v. Martinez*, 78 F.3d 399, 401 (8th Cir. 1996) (probable cause established where "two sources had identified Martinez as involved in drug trafficking," "authorities found evidence of drug trafficking during their search of Martinez's residence," vehicle was parked near the residence, and a different vehicle "registered to his wife had been used to transport drugs"); *United States v. Fladten*, 230 F.3d 1083, 1085-86 (8th Cir. 2000) (probable cause existed to search trunk of car that "was parked in the driveway of a house where agents had found evidence of drug-related activity" and that had glass condenser tube on back seat).

And even if some aspect of the affidavit were lacking, the good faith exception would apply.  The affidavit is clearly not so lacking in probable cause that a reasonable officer could not rely in good faith on its validity.  Further, McCabe does not even attempt to rebut the well-established principle that in assessing good faith, this court may consider "any information known to the officer[s] but not presented to the issuing judge." *Jackson*, 784 F.3d at 1231.  There is no dispute, and the record clearly shows, that by the time the warrant for the Buick was obtained and executed, surveillance officers *had in fact seen* McCabe put the suspicious duffel into the Buick and had placed him under arrest.  (Tr. 39 (defendants emerged with duffle and were arrested about 1:30pm); Tr. 43 (Buick searched after arrests); Ex. D at bates 869 (warrant application submitted at 2:43pm)).  The executing officers' reliance on the validity of the warrant was thus abundantly reasonable.

Considered from every angle, both the seizure and search of the Buick were lawful, and McCabe's motions to suppress the evidence found in the vehicle should be denied.

**E.    The Warrant to Search Apartment 1703 Was Supported by Probable Cause**

By now, it should likewise be clear that the warrant to search Apartment 1703, which is the most detailed of them all, was supported by abundant probable cause.  The affidavit recites various key facts linking Apartment 1703 to drug trafficking, including that McCabe was renting Apartment 1703 under an alias; had been observed within the past week emerging from the building and engaging in suspicious exchanges or meetings with another suspected drug dealer (C.K.); and had brought a suspicious duffel bag into the apartment building on the morning of March 25, around the same time as two other

suspected drug traffickers (C.K. and Rolack) arrived at the building.[6]  The authorities cited in McCabe's brief only confirm that these facts were adequate to give rise to probable cause to search the apartment.  *See, e.g., United States v. Patterson*, 666 F. App'x 569, 572 (8th Cir. 2016) (probable cause to search house where suspected drug dealer "came and went from a house in close proximity to her suspicious meetings"); *United States v. Keele*, 589 F.3d 940, 941–42 (8th Cir. 2009) (probable cause to search residence based on drug evidence recovered at car accident scene and affiant's training and experience that drug traffickers store evidence in their homes).  Even if it were a close question, which it is not, the affidavit would be entitled to good faith.  Any deficiency in the application can in no way be compared to a case like *Herron*, where the Eighth Circuit refused to apply the good faith exception to an affidavit that had been drafted to support the search of a different location and "barely touch[ed]" on the residence at issue.  *United States v. Herron*, 215 F.3d 812, 814-15 (8th Cir. 2000).  The motion to suppress should be denied.

---

[6]     The approximate times recited in the affidavit and Officer Ottney's statement that McCabe, Rolack, and C.K. entered the 1400 Laurel building "together" with the duffel bag are not materially distinguishable from Sergeant Klund's recollection that C.K. arrived and entered within "two minutes" of the other two. (Tr. 38).

**IV.    CONCLUSION**

For the foregoing reasons as well as those set forth in pre-hearing briefing, all of

McCabe's motions to suppress evidence should be denied in full.

Dated: December 28, 2020

Respectfully Submitted,

ERICA H. MacDONALD
United States Attorney

*/s/ Ruth S. Shnider*

BY:  RUTH S. SHNIDER
Assistant U.S. Attorney
Attorney ID No. 396707