# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

United States of America,                                    Crim. No. 20-106 (DWF/BRT)

                    Plaintiff,

v.
                                                             **REPORT AND**
Lamond Leroy McCabe,                                         **RECOMMENDATION**
*also known as* Pimp,

        Defendant.

---

Ruth Shnider, Esq., Assistant United States Attorney, counsel for Plaintiff.

Robert J. Shane, Esq., Shane Law Office, counsel for Defendant McCabe.

---

BECKY R. THORSON, United States Magistrate Judge.

On June 10, 2020, Defendant Lamond Leroy McCabe was indicted on one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; one count of possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 18 U.S.C. § 2; and one count of possession of firearms in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A) and 18 U.S.C. § 2. (Doc. No. 1.) This matter is before the Court on Defendant's five motions to suppress:

(1) Motion to Suppress Evidence Obtained from Laurel Village Management Office, relating to a search warrant executed on March 23, 2020 (Doc. No. 29);

(2) Motion to Suppress Evidence Obtained from Ion Swab on Exterior Apartment Door, relating to a search warrant executed on March 25, 2020 (Doc. No. 30);

(3) Motion to Suppress Evidence Obtained from the Warrantless Seizure of the Defendant's Buick Enclave, relating to the seizure of Defendant's Buick Enclave on March 25, 2020 (Doc. No. 31);

(4) Motion to Suppress Evidence Obtained from the Search of the Buick Enclave, relating to a search warrant executed on March 25, 2020 (Doc. No. 32); and

(5) Motion to Suppress Evidence Obtained from the Search of [the Laurel Apartment], relating to a search warrant executed on March 25, 2020 (Doc. No. 33).[1]

The matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. LR 72.1. This Court held a motion hearing on October 16, 2020, at which Minneapolis Police Sergeant Darcy Klund testified and five exhibits were received into evidence.[2] (*See* Doc. Nos. 67, 68.) Thereafter, the parties filed post-hearing briefs. (Doc. Nos. 74, 78.) For the reasons stated below, this Court recommends that Defendant McCabe's motions be denied.

## BACKGROUND

On March 23, 2020, as part of a narcotics investigation, Minneapolis police officer Marcus Ottney obtained a warrant to search "the following described premises: Wilson Park Tower Apartments, [XXXX] Laurel Avenue, Minneapolis, MN 55403" for the following property and things:

---

[1]    Defendant withdrew all his requests for *Franks* hearings that originally accompanied his motions to suppress relating to search warrants. (Doc. No. 64.)

[2]    Four of those exhibits—Exhibits A, C, D, and E—are the search warrants at issue in Defendant McCabe's motions. (Doc. No. 68.) One of the exhibits received at the hearing—Exhibit 1—is a search warrant that was at issue relating to a motion filed by Co-Defendant Rolack. (*Id.*) That motion has been withdrawn. (Doc. No. 76.)

- Rental agreements for unit [YYYY[3]]

- Rental application from WILLIAM MEHAN

- Rental application for anybody else associated with unit [YYYY]

- Historical surveillance footage from [XXXX] Laurel Avenue, including surveillance cameras inside and outside of the building

- File notes associated with unit [YYYY]

- Key fob reports for any key fobs associated with unit [YYYY]

- Phone numbers associated with unit [YYYY]

- Any additional addresses and information that was associated with unit [YYYY]

- Information on vehicles associated with unit [YYYY]

(Doc. No. 29, Attach. 1, 10/16/20 Hr'g Ex. A at 00001106.)

Officer Ottney explained in his affidavit in support of the warrant that officers had learned from a confidential reliable informant ("CRI"), whose various pieces of information had been corroborated, that a male with the initials C.K. buys and sells cocaine, drove a red Ford F-150 and transported cocaine using that vehicle, and had multiple stash houses around the metro where he keeps his narcotics and money from drug proceeds. (*Id.* at 00001101.) After further investigation and surveillance of C.K., officers obtained a search warrant for an ion swab sample from C.K.'s Ford truck exterior front driver's side door handle, which tested positive for cocaine. (*Id.* at 00001102.)

---

[3]    The Court redacts the identifying address numbers herein; the specific address numbers were provided in the search warrant application and search warrant.

Upon further surveillance on March 19, 2020, officers observed C.K. leave his home in Farmington, MN, and drive to a location near Hennepin Avenue and Laurel Avenue in Minneapolis. (*Id.*) There, officers watched a black male (later identified as Defendant McCabe) walk out of the Wilson Park Tower apartments located at XXXX Laurel Avenue, walk directly to C.K.'s truck with gloves on carrying what appeared to be a paper bag full of something, get into C.K.'s truck for approximately one minute, then leave and walk back toward the apartment building without the paper bag. (*Id.*) Once the man left C.K.'s truck, C.K. immediately drove away. (*Id.*)

Officers learned from an employee at the Wilson Park Tower apartments that the man who momentarily got into C.K.'s truck went by the name "William Mehan." (*Id.* at 00001103.) The apartment employee also volunteered that this man had an apartment at the Wilson Park Tower apartments (and provided the apartment number [YYYY]) located at [XXXX] Laurel Avenue, and that on his rental application he provided his birthday, stated he was from Florida, provided a Florida State Driver's License number, and registered a vehicle with the apartment bearing Florida license plates. (*Id.*) After learning this information, Officer Ottney then searched law enforcement databases, and was unable to locate a male named William Mehan from Florida. (*Id.*) He also discovered that the Florida license plate numbers that were provided did not exist in Florida's license plate database, nor did the license number provided exist in Florida state records. (*Id.*) Based on Officer Ottney's training and experience, he stated it was common when names, driver's license numbers, and license plates do not come back in State databases, that a person is lying about their identity. (*Id.*)

4

Officers continued their surveillance of C.K., and that evening they observed C.K. in his Ford truck park briefly at a surface parking lot in Minneapolis. (*Id.*) During that time, they observed a black male approach the truck on the passenger side. (*Id.*) Officers observed the passenger-side window roll down and observed what appeared to be the two males talking and counting something in the truck. (*Id.*) The male who had approached then walked away and left in a white Buick vehicle with Minnesota license plates DRK626. (*Id.*) Within the next 45 minutes, officers observed C.K. drive to three different locations making three brief stops; during two of them officers observed people get into the front passenger seat of C.K.'s truck for 1–2 minutes and then leave, and at the third stop officers observed a female get into the front passenger seat of the truck, the truck drove around the block, and then the female was dropped off back at her vehicle. (*Id.* at 00001103–04.) Officer Ottney states in his affidavit that based on his training and experience, these meet-ups appeared to be "drops," which is when a supplier meets with a seller and gives them more narcotics to sell, and the seller gives the supplier the money from narcotics sales from a previous "drop." (*Id.* at 00001104.) Officer Ottney also states that he knows through training and experience that people who sell narcotics typically have a location where they stash their narcotics and money proceeds from narcotics sales, and he believed that one of C.K.'s stash locations was at the Wilson Park Tower apartments. (*Id.*) He also stated that he believed that what they had observed that day was a male known as William Mehan retrieving a quantity of narcotics out of an apartment in the Wilson Park Tower apartments and delivering it to C.K. in his truck immediately prior to C.K. making his "drops." (*Id.*)

5

The next day, on March 24, 2020, officers obtained a search warrant for an "ion sample swab on the exterior apartment door from the hallway" at the premises described as "[XXXX] Laurel Avenue, apartment [YYYY]." (Doc. No. 30, Attach. 1, 10/16/20 Hr'g Ex. C at 00001116.) The search warrant stated that the search was to take place "between the hours of 7 a.m. and 8 p.m." (*Id.* at 00001117.) The affidavit in support of the ion swab search warrant included the same information as was in the March 23, 2020 search warrant. It also included a reference that the March 23, 2020 warrant had been executed and officers obtained records for the renter of unit [YYYY] from the apartment's management company. Officer Ottney also stated that "[t]hrough investigative techniques, [he] learned that WILLIAM MEHAN is an alias and the true identity of the male who rents unit [YYYY] is LAMOND LEROY MCCABE[.]" (*Id.* at 00001114.) Officer Ottney stated that he now believed it was Lamond McCabe who "retrieved a quantity of narcotics out of apartment [YYYY] (stash location) in the Wilson Park Tower apartments and delivered it to [C.K.] in his truck immediately prior to [C.K.] making his "drops." (*Id.*)

Prior to the ion swab search warrant being issued on March 24th, but after learning on March 23rd through investigative techniques that the true identity of the male who rented unit [YYYY] was Lamond McCabe, officers also learned that Mr. McCabe's address listed on his Minnesota driver's license was a certain address in Monticello, Minnesota, which was confirmed through property records. (Doc. No. 32, Attach. 1, 10/16/20 Hr'g Ex. D at 00000866.) On March 23, 2020, officers conducted surveillance on that address in Monticello, and observed a white Buick Enclave with license plates

6

DRK626 parked in the driveway (the same Buick observed on March 19, 2020). (*Id.*) Officer Ottney learned that the Buick was registered to Lamond McCabe. (*Id.*)

On March 25, 2020, officers again conducted surveillance at the McCabe residence in Monticello and observed Mr. McCabe get into the Buick in his driveway. (*Id.* at 00000867.) They followed him to a location in Bloomington where McCabe backed the Buick into a driveway up next to a closed garage door. (*Id.*) A man identified as Mario Rolack also arrived at this location in a Chevrolet Astro van. (*Id.*) The garage door opened, and a black male with a white female and children left the area in an SUV with Florida license plates. (*Id.*) The officers observed Rolack and McCabe meet in the driveway, go inside the garage, and close the garage door. (*Id.*) Approximately twenty minutes later, the garage door opened, Rolack and McCabe went to their own vehicles, and they drove away. (*Id.*) They both drove directly to [XXXX] Laurel Avenue. (*Id.*) Meanwhile, Officer Ottney had spotted C.K. in his red Ford truck in Minneapolis, and he followed the truck to [XXXX] Laurel Avenue. (*Id.*) At 10:37 a.m., officers watched McCabe take a black duffle bag with wheels out of his Buick and roll it into the front doors of [XXXX] Laurel Avenue. The bag appeared full and heavy. The officers observed McCabe, Rolack, and C.K. all walk into [XXXX] Laurel Avenue. (*Id.*) When C.K. walked in, he was wearing gloves and carrying a plastic bag. (*Id.*) At approximately 11:37 a.m., the officers then observed C.K. walk out of the apartment building and leave in his truck. (Doc. No. 33, Attach. 1, 10/16/20 Hr'g Ex. E at 00000418.)

At that point, Officer Ottney applied for two more search warrants – one for the Buick Enclave and one for apartment unit [YYYY] at [XXXX] Laurel Avenue. (Doc.

No. 32, Attach. 1, 10/16/20 Hr'g Ex. D; Doc. No. 33, Attach. 1, 10/16/20 Hr'g Ex. E.)

Officer Ottney provided all the above information in the applications for the search

warrants (excluding a few paragraphs regarding CRI corroboration and the suspected

"drops" in the application for the Buick search warrant); the affidavit for the search

warrant for the apartment unit included additional information regarding Mr. Rolack.

(*Id.*) While these search warrants were being obtained, officers (including Minneapolis

Police Sergeant Darcy Klund) continued surveillance at the apartment complex. Sergeant

Klund testified at the motions hearing that they observed Rolack and McCabe exit the

building with the black duffle bag. They rolled the bag to the Buick, and McCabe put the

bag in the back of the Buick. (Doc. No. 72, 10/16/20 Hr'g Tr. 39.) As Rolack started to

walk away, the officers took both Rolack and McCabe into custody. (*Id.* at 39–40.) The

Buick was then towed to the Minneapolis police impound lot where it was later searched

pursuant to a search warrant. (*Id.* at 41, 43–45.)

The search warrants for the Buick and the apartment were both issued and

executed on March 25, 2020. (Doc. No. 32, Attach. 1, 10/16/20 Hr'g Ex. D; Doc. No. 33,

Attach. 1, 10/16/20 Hr'g Ex. E.) Several items were found in the Buick, including the

black duffel bag which contained around 30 kilograms of cocaine, over 700 grams of

crack cocaine, two firearms, and drug packaging equipment; and several items were

found in the apartment, including Pyrex cookware, a large quantity of rubber gloves, drug

packaging, a money counter, and white residue that field-tested positive for cocaine.

(Hr'g Ex. D, Receipt, Inventory and Return; Hr'g Ex. E, Receipt, Inventory and Return.)

On June 10, 2020, Defendant McCabe was indicted for conspiracy to distribute controlled

substances, possession with intent to distribute controlled substances, and possession of firearms in furtherance of drug trafficking crimes. (Doc. No. 1.)

## DISCUSSION

Defendant McCabe challenges the validity of the four search warrants referenced above, as well as the seizure of McCabe's Buick Enclave at the time of his arrest. This Court addresses each motion below.

### I.    Motion to Suppress Records from Laurel Village Management Office

As a threshold issue, the Government argues that Defendant does not have standing to challenge the search warrant for documents found in the apartment rental office. Defendant McCabe contends that renters like him do have a reasonable expectation of privacy in their tenant files and therefore he does have standing to challenge the warrant.

Fourth Amendment rights are personal and cannot be asserted vicariously. *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). A defendant moving to suppress evidence must show a legitimate expectation of privacy in the thing searched. *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). A defendant who "fails to prove a sufficiently close connection to the relevant places or objects searched . . . has no standing to claim that they were searched or seized illegally." *Id.* A defendant seeking suppression has the burden of establishing a reasonable expectation of privacy, which the Court assesses by evaluating such factors as ownership, possession, and use of and ability to control the place searched or the item seized. *Pierson*, 219 F.3d at 806.

Applying these legal principles here, this Court concludes that Defendant lacked a reasonable expectation of privacy in the apartment management offices (or the entirety of the apartment complex as the address was stated on the warrant) or to the items that were seized. While Defendant may have had a personal interested in the specific apartment unit that he rented, Defendant had no *personal* interest in the location of the apartment management office or in any other unit or space that was a part of the apartment complex at [XXXX] Laurel Avenue. Further, the items that were to be seized (i.e., rental agreement, rental applications, surveillance footage, file notes, key fob reports, phone numbers, address information, or vehicle information), appear to be of the type that a landlord would use on a regular basis to conduct its business and do not appear to be items that Defendant himself "owns." Therefore, Defendant has not met his burden to "show a personal connection to the place[s] searched or the item[s] seized and that he attempted to keep the place[s] and item[s] private." *See United States v. Taylor*, 232 F. Supp. 3d 741, 761–62 (W.D. Pa. 2017) (finding defendant did not have a personal interest in the location of the office building as a shareholder, nor to his office space, nor to the items that were seized, as they were all property of the business) (quoting *United States v. Nagle*, 803 F.3d 167, 178 (3d Cir. 2015)); *see also United States v. Jesh*, No. CRIM 10-165 DSD/JJK, 2010 WL 4025070, at *2 (D. Minn. Sept. 10, 2010) (concluding that the defendant lacked legal standing to challenge the lawfulness of the searches of office spaces), *report and recommendation adopted*, 2010 WL 4116613 (D. Minn. Oct. 13, 2010).

Moreover, the government does not infringe upon a legitimate expectation of privacy of a person who has disclosed the information to a third party. "This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed." *United States v. Miller*, 425 U.S. 435, 443 (1976); *see also United States v. Sesay*, 937 F.3d 1146, 1152 (8th Cir. 2019) ("Even where a person discloses information to a third party on the assumption that it will be used only for a limited purpose, the government typically is free to obtain that information without infringing on a legitimate expectation of privacy of the person who made the original disclosure." (quotations omitted)). This Court finds the court's comments in *In re United States*, 665 F. Supp. 2d 1210, 1223–24 (D. Or. 2009), persuasive:

> If a suspect leaves private documents at his mother's house and the police obtain a warrant to search his mother's house, they need only provide a copy of the warrant and a receipt to the mother, even though she is not the "owner" of the documents . . . . In such a case, it is irrelevant that the suspect had a greater privacy interest in the content of the documents than did his mother. When he left the documents in her possession he no longer has a reasonable expectation of privacy in their contents. *See California v. Greenwood*, 486 U.S. 35, 41, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (holding that "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties" (quoting *Smith v. Maryland*, 442 U.S. 735, 743–44, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979))); *see also United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be

betrayed." (citing *United States v. White*, 401 U.S. 745, 752, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971))). In fact, the suspect in such a case, were he to become a defendant in court, would ***not have standing to object*** if there were constitutional deficiencies in the warrant used to search his mother's home. *United States v. Payner*, 447 U.S. 727, 731–32, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (holding that a defendant had no standing to object to the illegal seizure of his financial records from his banker); *see also Rawlings v. Kentucky*, 448 U.S. 98, 105–06, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (holding that defendant did not have standing to object to search of a third party's purse, despite the fact that he claimed ownership of the drugs found in that purse, because he had no legitimate expectation of privacy in someone else's purse); *Rakas v. Illinois*, 439 U.S. 128, 149, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (holding that defendants could not make a Fourth Amendment claim regarding a search of someone else's car because they had no "legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers").

*Id.* at 1223–24 (emphasis added). Surely the expectation of privacy in private documents left at one's mother's home would likely be higher than those provided to a third-party in a rental office. However, in both situations, when a person voluntarily turns over information to a third party, the person no longer has a legitimate expectation of privacy in that information. *See Sesay*, 937 F.3d at 1152 (concluding that the defendant "had no legitimate expectation of privacy in the identification card that he provided when registering at the motel"). Accordingly, Defendant does not have standing to challenge the search warrant for [XXXX] Laurel Avenue, and Defendant's Motion to Suppress should be denied.[4]

---

[4]    Because this Court finds that Defendant does not have standing to challenge this search warrant, this Court declines to address the other substantive challenges to the validity of the search warrant. *See Taylor*, 232 F. Supp. 3d at 762 (finding that given the Court's holding, it was "in the interests of judicial economy to decline to fully discuss and resolve the parties' disputes as to the substantive challenges to the search warrant and execution thereof").

## II.    Motion to Suppress the Ion swab Search Results

The next search warrant that Defendant McCabe challenges is the Ion swab search warrant. Defendant argues that the search warrant is invalid because it was executed before the time authorized in the search warrant,[5] and he also argues that the warrant fails to show probable cause. The Government "acknowledges that the Ion swab was taken approximately 30–45 minutes earlier than the time window authorized by the terms of the warrant," but also represents that "the Government does not intend to offer evidence of the Ion swab in its case-in-chief at trial." (Doc. No. 60, Gov't's Resp. in Opp'n to Defs.' Pretrial Mots. 12.) The Government asserts that, based on its representation, the motion should be denied as moot and the "only issue for the Court is whether the inclusion of facts regarding the Ion swab in other search warrant applications (i.e., for the search of McCabe's Buick and for the search of Apartment [YYYY]) renders those warrants invalid." (*Id.*; *see also* Doc. No. 78, Gov'ts Post-Hr'g Mem. in Opp'n to Def. McCabe's Motions to Suppress Evid. 11.)

Based on the Government's representation that it will not offer evidence of the Ion swab in its case-in-chief at trial, this Court recommends that Defendant's Motion to Suppress Evidence Obtained from Ion Swab on Exterior Apartment Door (Doc. No. 30) be denied as moot. Because this Court so recommends, this Court does not address the other arguments raised by the parties relating to the Ion swab search warrant, including the argument regarding Defendant's standing, that the warrant is invalid because it was

---

[5]    It is undisputed that the officers executed the warrant at 6:15 a.m., and the face of the search warrant allows for execution between 7 a.m. and 8 p.m.

executed before the time authorized, and that the warrant lacks probable cause. This
Court does note, however, that in reviewing the latter two search warrants for the search
of McCabe's Buick and for the search of apartment [YYYY], this Court—as explained
further below—finds that probable cause for the warrants existed even without the
information in the affidavits relating to the Ion swab search and Ion swab search results.

### III.    Motion to Suppress Evidence Based on Search and Seizure of Buick

Officers seized Defendant McCabe's Buick Enclave after his arrest and had the
vehicle towed to the Minneapolis police impound lot where it was later searched pursuant
to a search warrant. (*Id.* at 41, 43–45.) Defendant argues that both the seizure of the
Buick and the search warrant lacked probable cause. Because the same alleged facts in
the search warrant application supporting probable cause for the search also would
support probable cause for the seizure of the Buick, this Court addresses these two
motions together. *See Chambers v. Maroney*, 399 U.S. 42, 52 (1970) ("[W]e see no
difference between on the one hand seizing and holding a car before presenting the
probable cause issue to a magistrate and on the other hand carrying out an immediate
search without a warrant.").

The Fourth Amendment requires probable cause to be shown before a search
warrant is authorized. U.S. Const. amend. IV; *Williams*, 477 F.3d at 557. In determining
whether probable cause exists, a detached and neutral judge must make "a practical,
common-sense decision whether, given all the circumstances set forth in the affidavit
before him . . . there is a fair probability that contraband or evidence of a crime will be
found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *see also Walden*

*v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998) ("The standard of probable cause for the issuing judge is whether, given the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (quotations omitted)). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Gates*, 462 U.S. at 232. Courts should not review search warrants in a hyper-technical fashion. *United States v. Caswell*, 436 F.3d 894, 897 (8th Cir. 2006).

"When . . . the issuing court relies solely on an affidavit to determine whether probable cause exi[sts], only the information found within the four corners of the affidavit may be considered." *United States v. Wells*, 347 F.3d 280, 286 (8th Cir. 2003) (quotations omitted). In reviewing the decision of the issuing court, this Court must ensure that the court "'had a substantial basis for . . . conclud[ing] that probable cause exists.'" *United States v. Oropesa*, 316 F.3d 762, 766 (8th Cir. 2003) (quoting *Gates*, 462 U.S. at 238–39). Because reasonable minds may differ on whether a particular search-warrant affidavit establishes probable cause, the issuing court's determination is accorded great deference. *United States v. Wajda*, 810 F.2d 754, 760 (8th Cir. 1987) (citing *United States v. Leon*, 468 U.S. 897, 914 (1984)).

This Court concludes that the supporting affidavit for the search of the Buick does provide sufficient probable cause for the search and therefore likewise provides sufficient probable cause for the vehicle's seizure as well. (*See generally* Doc. No. 32, Attach. 1, 10/16/20 Hr'g Ex. D.) As explained above, the application for the search warrant

15

included information about C.K.—both information provided by a CRI[6] and information

learned through officer surveillance—indicating a fair probability that C.K. was involved

---

[6]    For some reason unknown, Officer Ottney did not include in this search warrant application the additional information that corroborated some of what the CRI had reported to law enforcement (which was included in the prior search warrants for the Wilson Park Towner Apartments or for the Ion swab search). This search warrant application also did not include the additional detail regarding the "drops" as was provided in the earlier search warrant applications. However, simply because the affidavit did not provide the factual basis for the CRI's knowledge regarding C.K.'s drug dealings, does not mean that the warrant was not supported by the necessary probable cause. "[A]n Affidavit supported by information supplied by a CRI supplies probable cause as long as that information is reasonably determined to be reliable, which requires corroboration by independent evidence." *United States v. Rekonen*, No. 07-123 (JNE/RLE), 2007 WL 2973840, at \*12 (D. Minn. Oct. 9, 2007). However, "[s]uch reliability can be established through independent corroboration or the informant's track record of providing trustworthy information." *United States v. Williams*, 10 F. 3d 590, 593 (8th Cir. 1993). The Eighth Circuit has explained as follows:

> When a confidential informant provides information in support of a search warrant, the issuing magistrate considers the informant's reliability and the basis of his knowledge. *Gates*, 462 U.S. at 233, 103 S.Ct. 2317. The totality of the circumstances analysis, however, does not mandate that both factors be present before a warrant may issue. Instead, a strong showing of one may compensate for a deficiency in the other. *Id.* For example, if an "informant is known for the unusual reliability of his predictions of certain types of criminal activities in a locality, his failure, in a particular case, to thoroughly set forth the basis of his knowledge surely should not serve as an absolute bar to a finding of probable cause . . . ." *Id.; see also United States v. Anderson*, 933 F.2d 612, 615 (8th Cir. 1991). The information from a CRI is sufficiently reliable if it is corroborated by other evidence, or if the informant has a history of providing reliable information. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

*United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004). Here, in a prior search warrant application that resulted in the issuance of a search warrant signed by the same judge, Officer Ottney had explained that "[t]his CRI has provided information to law enforcement in the past that has been found to be timely, accurate, and truthful" and that "[t]he information provided by this CRI has led to arrests and convictions in Minnesota State Court." (Doc. No. 29, Attach. 1, 10/16/20 Hr'g Ex. A at 00001101.) Also, that prior search warrant application included additional facts that corroborated some information

in buying and selling narcotics. (*Id.* at 00000864.) The affidavit then goes on to link C.K. with McCabe by providing information about how officers observed suspicious activity by both C.K., McCabe, and Rolack. (*Id.* at 00000864–68.) The affidavit includes information about how officers learned through material provided by a Wilson Park Tower apartment employee that McCabe had been using an alias at the apartment complex where he rented a unit, and later determined that the true renter was McCabe and that the name, social security number, and Florida identification card presented to the apartment management company to rent the unit were fictitious; that McCabe and C.K. met briefly at C.K.'s truck outside of the apartment complex whereby McCabe delivered a paper bag that looked full to C.K. while wearing gloves, which the officer found suspicious; that McCabe and C.K. were seen later that same day meeting at C.K.'s truck, apparently counting something inside the truck, and that McCabe left in a white Buick

---

that the CRI had provided. "Even the corroboration of minor, innocent details" can be enough to support a finding of probable cause. *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (quotations omitted).

      Further, even if this Court were to remove the one paragraph in the Buick search warrant application referencing what the CRI knew and described, this search warrant would still be supported by probable cause based on the totality of the circumstances, including the surveillance of C.K. by the officers described in the application and the observations of McCabe between March 19 and March 25, 2020. In addition, as further discussed below, even if probable cause were lacking, the *Leon* good-faith exception would apply to this search warrant based not only on what was contained in the search warrant affidavit, but also considering "any information known to the officer[s] but not presented to the issuing judge." *United States v. Jackson*, 784 F. 3d 1227, 1231 (8th Cir. 2015). At the time the officers presented the search warrant for the Buick to the issuing judge, they knew all the corroborative information regarding C.K. that was documented in the prior search warrant applications, and they also had by that time observed McCabe and Rolack exit the apartment complex and place the black duffle bag back into McCabe's Buick.

with license plates DRK626; that the officer believed C.K. then made "drops" throughout the South Minneapolis area during the evening of March 19, 2020; that the white Buick with license plates DRK626 (which was registered to McCabe) was observed on March 23, 2020, at an address in Monticello that matched the address on McCabe's driver's license; that on March 25, 2020, officers observed McCabe leave his home in Monticello in the Buick, meet Rolack at a home in Bloomington where the two went into the garage for approximately twenty minutes and then were seen leaving at the same time in their own vehicles; that from there, McCabe and Rolack drove to the Laurel Avenue apartment without making any stops, McCabe was seen taking what appeared to be a full and heavy black duffle bag with wheels out of his Buick and rolling the bag into the apartment complex with Rolack; and that C.K. also arrived during this time and was seen entering the apartment complex wearing gloves and carrying a plastic bag. (*Id.* at 00000864–68.) The affidavit also included averments by Officer Ottney that he knows through training and experience that "people who sell narcotics will typically conceal narcotics in some type of bag or container when transporting the narcotics in public" and that "narcotics dealers will store narcotics in storage units associated with their apartment or house, so all their narcotics are not in one place." (*Id.* at 00000867.) Officer Ottney also stated that he "knows that gang members and narcotics dealers routinely transport firearms inside of vehicles, inside stash houses, and inside storage units so they have quick and easy access to the firearms for protection from rival narcotics dealers and rival gang members." (*Id.* at 00000868.) Officer Ottney then summarized his affidavit as follows:

Your affiant learned that apartment [YYYY] at [XXXX] Laurel Avenue in Minneapolis was obtained by LAMOND MCCABE under a fake name . . . .[7] Through various surveillance techniques, your affiant observed LAMOND MCCABE, [C.K.], and MARIO ROLACK all enter [XXXX] Laurel Avenue either together or at different times. Your affiant has observed all three of the males conduct suspected narcotics sales throughout the last week. In particular, your affiant has observed the Buick Enclave, bearing Minnesota license plates DRK626, be used by LAMOND MCCABE to transport suspected narcotics and money proceeds from the sales of narcotics.

(*Id.*) Defendant argues about what information he believes is missing from the affidavit or about what information was not provided by the CRI or Officer Ottney. However, this Court concludes that the information that was provided in the affidavit, considering the totality of those facts together, established probable cause (and more than a hunch) to believe that McCabe was committing, has committed, or was about to commit a crime, and that there was fair probability evidence of the crime (illegal narcotics possession and/or distribution) would be found in the Buick Enclave registered and driven by McCabe. "[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *D.C. v. Wesby*, 138 S. Ct. 577, 588 (2018). And "[a] law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not." *Technical Ordinance, Inc. v. United States*, 244 F.3d 641, 649 (8th Cir. 2001).

Finally, even if probable cause did not exist, this was a facially valid warrant, and therefore the good-faith exception to the exclusionary rule, established in *United States v.*

---

[7]     As explained above, this Court ignores reference to the Ion swab search results in its determination of probable cause for this warrant.

*Leon*, 468 U.S. 897 (1984), would have to be considered. "Under the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008). "The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (alteration in original) (quotations omitted). "When assessing the objective [reasonableness] of police officers executing a warrant, [the Court] must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge." *Id.* at 431 (alteration in original) (quotations omitted). Here, this Court concludes that the good-faith exception would apply to the search warrant for the Buick. There is no evidence to suggest that the officers' reliance on the warrants was not in good faith, nor is there evidence that the officers' reliance was not reasonable. For these reasons, this Court concludes that the evidence seized as a result of the execution of the search warrant should not be suppressed and Defendant's motions should be denied.

## IV.    Motion to Suppress Evidence Found at the Apartment

Defendant argues that the search warrant application for apartment [YYYY] at [XXXX] Laurel Avenue failed to describe a nexus between the alleged criminal activity (i.e., drug trafficking) and the apartment, and therefore it lacked probable cause as required by the Fourth Amendment. This Court disagrees and concludes that the supporting affidavit for the warrant to search apartment unit [YYYY] (Doc. No. 33,

Attach. 1, 10/16/20 Hr'g Ex. E), establishes probable cause. In addition to the same

information that was included in the search warrant for the Buick, this affidavit did

include paragraphs describing corroboration of the CRI information and further detailing

the suspected "drops" by C.K. after meeting with McCabe. The affidavit also included

additional information regarding Mr. Rolack, including that he was known to buy and sell

cocaine from C.K. and that he was observed by the CRI conducting multiple narcotics

transactions using a "work van" that says "R & R" on the side. The totality of the

information provided in the application supports a finding that there was a fair probability

that McCabe, C.K., and Rolack were involved in drug trafficking and that there was a fair

probability that evidence of a crime would be found in apartment [YYYY] – the

apartment that McCabe rented using an alias; the apartment McCabe was seen coming

and going from before and after meeting C.K. (a suspected drug dealer), providing a

suspicious paper bag, which then lead to observations that, based on the officers training

and experience, appeared to be C.K. conducting "drops"; and the apartment where

McCabe and Rolack (another suspected drug dealer) were seen entering together with a

suspicious black duffle bag on wheels, where C.K. was observed meeting moments later

with a plastic bag.[8] The fact that officers did not observe any of these three men actually

enter the specific unit is of no moment, as it was a reasonable inference that the unit was

where they were coming and going from since McCabe rented that unit in that building.

In addition, the surveillance reported in the affidavit was not stale, as the observations of

---

[8]     Whether C.K. arrived at the same time, or shortly thereafter, does not change the
analysis or the outcome.

C.K., McCabe, and Rolack occurred both on the same day that the search warrant was obtained and during the week to two-week period preceding. *See United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (stating that "there is no bright-line test for determining when information is stale" and rejecting an argument in a narcotics case involving information more than two-weeks old). Based on the facts provided (excluding the evidence regarding the Ion swab search and test results), there was probable cause to believe that further evidence of drug trafficking activity would be found in the apartment that McCabe rented. *See, e.g.*, *United States v. Patterson*, 666 F. App'x 569, 572 (8th Cir. 2016) (finding probable cause to search a house where suspected drug dealer "came and went from a house in close proximity to her suspicious meetings").

Furthermore, as was the case with the Buick search warrant, even if probable cause did not exist, the search warrant for the apartment unit was a facially valid warrant, and the *Leon* good-faith exception would have to be considered. *Leon*, 468 U.S. 897 (1984). As previously stated, "[u]nder the good-faith exception, evidence seized pursuant to a search warrant that lacked probable cause is admissible if the executing officer's good-faith reliance on the warrant is objectively reasonable." *Perry*, 531 F.3d at 665. The question is "whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization." *Proell*, 485 F.3d at 430. Looking at the totality of the circumstances, "including any information known to the officers but not presented to the issuing judge," *id.* at 431, this Court concludes that the good-faith exception applies. As was the case with the other warrant, there is no evidence to suggest that the officers' reliance on this warrant was not in good faith, nor is there evidence that

the officers' reliance was not reasonable. Unlike the case in *United States v. Herron*, 215 F.3d 812, 814 (8th Cir. 2000), a case relied on by Defendant, where the affidavits did "not say very much about Mr. Herron or his residence,"[9] here, the affidavits included several references to surveillance conducted outside the apartment at issue that indicated probable narcotics trafficking activity with McCabe's participation. Therefore, for all the reasons stated, Defendant's Fourth Amendment rights were not violated with respect to the search warrant for the apartment unit, and Defendant's motion to suppress should be denied.

## RECOMMENDATION

Based on the file, record, and proceedings herein, and for the reasons stated above,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant McCabe's Motion to Suppress Evidence Obtained from Laurel Village Management Office (Doc. No. 29) be **DENIED**;

2. Defendant McCabe's Motion to Suppress Evidence Obtained from Ion Swab on Exterior Apartment Door, (Doc. No. 30) be **DENIED AS MOOT**;

3. Defendant McCabe's Motion to Suppress Evidence Obtained from the Warrantless Seizure of the Defendant's Buick Enclave (Doc. No. 31) be **DENIED**;

4. Defendant McCabe's Motion to Suppress Evidence Obtained from the Search

---

[9] The court in *Herron* explained that "[i]n total, the affidavits make only two passing references to the Herron residence (to note Buck, Jr.'s presence there and to request a search warrant for the residence) and only three total references to Mr. Herron (to note his criminal background, to note his familial relation to the Bucks, and to describe him as an occupant of the property to be searched)." *Herron*, 215 F.3d at 814, n.2.

of the Buick Enclave (Doc. No. 32) be **DENIED**; and

    5.  Defendant McCabe's Motion to Suppress Evidence Obtained from the Search

of [the Laurel Apartment] (Doc. No. 33) be **DENIED**.


Date:  January 29, 2021                 *s/ Becky R. Thorson*
                                                   BECKY R. THORSON
                                                  United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **February 12, 2021**. A party may respond to those objections by **February 26, 2021**. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.